Atterbury v. U.S. Marshals Service

# UNITED STATES COURT OF APPEALS
## FOR THE SECOND CIRCUIT

————————————

August Term, 2015

(Argued: September 10, 2015    Decided: November 3, 2015)

Docket No. 14-2805-cv

————————————

STEPHEN L. ATTERBURY,

*Plaintiff-Appellant*,

— v. —

UNITED STATES MARSHALS SERVICE, GARY INSLEY, Contracting Officer, Office of Security Contracts, Judicial Division, United States Marshals Service, in his individual capacity, and JOHN DOE, in his individual capacity,

*Defendants-Appellees*.

————————————

B e f o r e:

LYNCH, LOHIER, and CARNEY, *Circuit Judges*.

————————————

1

Plaintiff-Appellant Stephen L. Atterbury appeals from a judgment of the United States District Court for the Western District of New York (Richard J. Arcara, *Judge*) dismissing his complaint for failure to state a claim and for lack of subject-matter jurisdiction. He alleges that Defendants-Appellees the United States Marshals Service and Gary Insley violated his rights under the Due Process Clause and acted arbitrarily and capriciously by terminating his employment as a Court Security Officer. We agree with the district court that Atterbury does not have a private right of action under the Due Process Clause of the sort recognized in Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics, 403 U.S. 388 (1971), and accordingly that claim was properly dismissed. We find, however, that the district court erred in determining that it lacked subject-matter jurisdiction over Atterbury's claim under the Administrative Procedure Act.

AFFIRMED IN PART, VACATED IN PART, AND REMANDED.

THOMAS N. CIANTRA (Kate M. Swearengen, *on the brief*), Cohen, Weiss and Simon LLP, New York, New York, *for Plaintiff-Appellant*.

MICHAEL S. CERRONE, Assistant United States Attorney, *on behalf of* William J. Hochul, Jr., United States Attorney for the Western District of New York, Buffalo, New York, *for Defendants-Appellees*.

GERARD E. LYNCH, *Circuit Judge*:

Plaintiff-Appellant Stephen L. Atterbury's employment as a Court Security Officer ("CSO") was terminated when Defendants-Appellees the United States Marshals Service ("USMS") and Gary Insley determined that he had violated

2

USMS's performance standards. Because Atterbury was employed by a federal contractor, rather than directly by USMS, he could not challenge his dismissal under the administrative scheme that regulates the federal civil service. Nor could he avail himself of the remedial scheme that governs disputes between contractors and the federal government. He instead brought this action, alleging that the defendants violated his rights under the Due Process Clause and acted arbitrarily and capriciously by terminating his employment. The United States District Court for the Western District of New York (Richard J. Arcara, *Judge*) dismissed his complaint for failure to state a claim and for lack of subject-matter jurisdiction.

We agree with the district court that Atterbury does not have a private right of action under the Due Process Clause of the sort recognized in <u>Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics</u>, 403 U.S. 388 (1971), and accordingly that claim was properly dismissed. We find, however, that the district court erred in determining that it lacked subject-matter jurisdiction over Atterbury's claim under the Administrative Procedure Act ("APA"). Accordingly, the judgment of the district court is AFFIRMED IN PART and VACATED IN PART, and the case is REMANDED for further proceedings consistent with this opinion.

## BACKGROUND

Because Atterbury appeals from the grant of a motion to dismiss under Fed. R. Civ. P. 12(b)(1) and (b)(6), we draw the following facts from the complaint and accept them as true for the purposes of this appeal.[1] Loginovskaya v. Batratchenko, 764 F.3d 266, 268 n.2 (2d Cir. 2014).

USMS provides security services for United States courts and judicial officers, and contracts with private security companies that recruit and employ persons with law enforcement experience to participate in USMS's Court Security Program as CSOs. Atterbury was employed by one such contractor, Akal Security, Inc. ("Akal"), as a CSO for the Kenneth B. Keating Federal Building in Rochester, New York. Under the terms of the contract between USMS and Akal, USMS retained the sole discretion to remove a CSO from the Court Security Program. Further, the Akal–USMS contract incorporated fifty-eight "CSO

---

[1] In dismissing the APA claim under Rule 12(b)(1), the district court was permitted to rely, in addition to the complaint, on non-conclusory, non-hearsay portions of declarations submitted by the parties as part of their briefing. M.E.S., Inc. v. Snell, 712 F.3d 666, 671 (2d Cir. 2013). The declarations submitted by the defendants in particular present a significantly different version of the facts from what is alleged in the complaint. For the purposes of Atterbury's appeal from the dismissal of his Bivens claim under Rule 12(b)(6), however, we are required to accept as true the complaint's factual allegations. In any event, the factual disputes surrounding the events that led to Atterbury's dismissal are not material to the resolution of the purely legal questions at issue here. See id.

4

Performance Standards" promulgated by USMS, which set forth a detailed code of conduct for CSOs. As a condition of his participation in the Court Security Program, Atterbury was required to acknowledge that he had reviewed the Performance Standards and was subject to them. USMS was empowered to request that Akal investigate suspected violations of the Performance Standards, but it reserved the authority to remove CSOs from the Court Security Program even when Akal determined that no violation had occurred.

The conditions of Atterbury's employment with Akal were governed by a collective bargaining agreement ("CBA"), which provided that no employee having completed his probationary period would be disciplined or terminated without just cause. The CBA also provided, however, that if a CSO was removed from the Court Security Program by USMS, his employment with Akal could be terminated "without recourse to the procedures under [the CBA]." J.A. 11.

On February 24, 2011, Atterbury was assigned to a "roving post" where he was responsible for the security of courtrooms and adjacent areas. In the complaint's version of the events, Atterbury had been suffering from a cold for several days, and at 1:30 p.m., feeling "febrile and nauseous," J.A. 13, he advised Acting Lead CSO Jerry Risley, who was the highest-ranking Akal employee on

5

duty at that time, that he was going home. Risley responded, "See ya," id., and

Atterbury left for the day. News of this incident made its way to USMS, which

requested that Akal investigate whether Atterbury's departure violated CSO

Performance Standard 31, which provides that a CSO must not leave his assigned

post until relieved or directed to do so by a supervisor.

On May 3, following an investigation during which several witnesses were

interviewed, Akal submitted a report to USMS that concluded that Atterbury had

not violated the Performance Standards and recommended that he not face

discipline. USMS disagreed, and directed Akal to reinterview one witness. Akal

complied, and then advised USMS that its conclusion had not changed. On May

5, Defendant-Appellee Gary Insley, the USMS Contracting Officer assigned to the

Akal–USMS contract, sent Akal a letter stating that Atterbury's actions "ha[d]

undermined the District's confidence and trust in [his] ability to effectively

perform his duties," J.A. 16, and permanently removing him from the Court

Security Program. Akal then informed Atterbury that, under the terms of the

contract, he was entitled to respond in writing to USMS's decision. Atterbury,

however, was not told what conduct had led to his removal. He submitted a one-

page statement, but on June 24, Insley notified Akal that Atterbury's "appeal of

6

removal" had been denied. Akal then terminated Atterbury's employment.

Atterbury brought this action, asserting one cause of action under the Due Process Clause of the Fifth Amendment to the U.S. Constitution, and one cause of action under the APA. The defendants moved for dismissal under Fed. R. Civ. P. 12(b)(6) "and/or" Fed. R. Civ. P. 56. J.A. 21. The case was referred to Magistrate Judge Leslie G. Foschio, who issued a Report and Recommendation ("R&R") advising that the district court dismiss the Due Process claim and the APA claim, the latter for lack of subject-matter jurisdiction. The district court, over Atterbury's objections, adopted the R&R. This appeal followed.

## DISCUSSION

We review the district court's dismissal of the complaint under Rules 12(b)(1) and 12(b)(6) de novo, accepting as true the allegations in the complaint and drawing all reasonable inferences in favor of the plaintiff. Town of Babylon v. Fed. Hous. Fin. Agency, 699 F.3d 221, 227 (2d Cir. 2012).

I.  Bivens Claim

Atterbury asserts his first cause of action directly under the Fifth Amendment's Due Process Clause. The Supreme Court first recognized an implied cause of action for damages under the Constitution in Bivens, in which

7

the plaintiff alleged that federal narcotics agents had entered and searched his apartment and arrested him in violation of the Fourth Amendment. That decision "established that a citizen suffering a compensable injury to a constitutionally protected interest could . . . obtain an award of monetary damages against the responsible federal official," Butz v. Economou, 438 U.S. 478, 504 (1978), even in the absence of a federal statutory cause of action.

More recently, however, the Supreme Court has narrowed the reach of that principle, explaining that the recognition of such a cause of action "is not an automatic entitlement," but must instead "represent a judgment about the best way to implement a constitutional guarantee." Wilkie v. Robbins, 551 U.S. 537, 550 (2007). The analysis of whether to extend Bivens to a new context proceeds in two steps. First, a court must determine "whether any alternative, existing process for protecting the interest amounts to a convincing reason for the Judicial Branch to refrain from providing a new and freestanding remedy in damages." Id. Second, even in the absence of such an alternative process, a court "must make the kind of remedial determination that is appropriate for a common-law tribunal, paying particular heed, however, to any special factors counselling hesitation before authorizing a new kind of federal litigation." Id., quoting Bush

8

v. Lucas, 462 U.S. 367, 378 (1983).  This two-part test has only rarely yielded a new Bivens remedy; indeed, the Supreme Court has extended Bivens to contexts other than unreasonable searches and seizures only twice, most recently thirty-five years ago in Carlson v. Green, 446 U.S. 14 (1980).

The defendants urge us to affirm the district court on the grounds that the Contract Disputes Act of 1978 ("CDA"), 41 U.S.C. § 7101 *et seq.*, affords Atterbury an alternative process for protecting his rights that precludes the recognition of a Bivens claim at the first step of the Wilkie test.  The CDA provides a comprehensive procedural framework for the resolution of disputes arising from contracts with the federal government.  In M.E.S., Inc. v. Snell, we characterized the CDA's "remedial scheme as 'the paradigm of a precisely drawn, detailed statute,' which 'purports to provide final and exclusive resolution of all disputes arising from government contracts' that fall within its ambit," 712 F.3d 666, 673 (2d Cir. 2013), quoting A & S Council Oil Co. v. Lader, 56 F.3d 234, 241 (D.C. Cir. 1995), and held that the CDA precluded us from devising a Bivens remedy for a contractor that alleged that its contracts had been unlawfully terminated.  Id. at 676.

Unlike the contractor in M.E.S., however, Atterbury is not in privity with the United States and – the parties agree – has no standing to bring a claim under the CDA.[2]  The defendants nevertheless argue that the CDA provides Atterbury with an alternative process for protecting his interests because Akal could have brought a CDA claim on his behalf.  We disagree.  While it is true that courts will not imply a new Bivens right of action simply because "existing remedies do not provide complete relief for the plaintiff," Bush, 462 U.S. at 388, we decline to hold that a Bivens right of action is categorically barred whenever a third party could bring suit on the plaintiff's behalf.  The facts before us illustrate the undesirability of such a rule.  Akal is under no obligation to defend Atterbury's rights, and indeed may prefer to acquiesce in Atterbury's dismissal rather than damage its relationship with the federal government by bringing suit against it.  The alternative process available to Atterbury under the CDA is thus much too contingent automatically to preclude a Bivens remedy.

We nonetheless conclude that the existence of the CDA's remedial scheme is a special factor counseling hesitation at the second step of the Wilkie test.  As

---

[2] "[T]he provisions of the CDA apply only to 'contractors,'" Winter v. FloorPro, Inc., 570 F.3d 1367, 1370 (Fed. Cir. 2009), and "contractor" is defined as "a party to a Federal Government contract other than the Federal Government," 41 U.S.C. § 7101(7).

noted above, that scheme, while purporting to be comprehensive, does not provide a remedy for subcontractors or employees of contractors. Under the Supreme Court's more recent Bivens jurisprudence, courts generally assume that the omission of particular relief from a comprehensive congressional scheme "has not been inadvertent." Schweiker v. Chilicky, 487 U.S. 412, 423 (1988); see also M.E.S., 712 F.3d at 672. In this case, that assumption finds additional support in the CDA's legislative history. The Senate Report lays out the justifications for Congress's decision to adopt a "single point of contact approach," that is, to deny to anyone but prime contractors access to the CDA's administrative remedies. S. Rep. No. 95-1118, at 16–17 (1978). It explains that such an approach "helps suppress frivolous claims," id. at 16, and "forc[es] the prime contractor and the subcontractor to negotiate their disputes," thereby preventing "additional time-consuming and expensive litigation." Id. at 17. It recognizes the "inequities" flowing from that approach, but concludes that they "are best handled by improved subcontract administration by the prime contractor," and that the "additional problems" of bringing subcontractors within the scope of the CDA "outweigh the benefit to be gained." Id. While the Senate Report explicitly addresses only the exclusion of subcontractors, the

11

"single point of contact approach" would also require the exclusion of employees of contractors like Atterbury. We would be encroaching upon Congress's authority were we to create a remedy for Atterbury where Congress intentionally withheld one, M.E.S., 712 F.3d at 672; Dotson v. Griesa, 398 F.3d 156, 169 (2d Cir. 2005) – particularly where, as here, the decision to withhold the remedy was motivated in large part by a desire to curb litigation against the government.

Another factor counseling hesitation is the fact that extending a Bivens remedy to Atterbury would paradoxically put him in a better situation than two similar classes of plaintiffs for whom Congress *did* create a remedy. Atterbury is situated in what the district court termed a "remedy-less 'gap,'" J.A. 332, between the CDA and a second comprehensive remedial scheme: the Civil Service Reform Act ("CSRA"), which "represents Congress's comprehensive identification of the employment rights and remedies available to federal civil service personnel." Dotson, 398 F.3d at 160. If Atterbury had been directly employed by the federal government, his exclusive remedy would lie under the CSRA, and he would be precluded from bringing a Bivens claim. Bush, 462 U.S. at 368; Dotson, 398 F.3d at 160. Alternatively, if he were a federal contractor, he would be limited to the remedies provided by the CDA and his Bivens claim would similarly be barred.

12

M.E.S., 712 F.3d at 668–69. Neither the CDA nor the CSRA allows an aggrieved party to bring a plenary action for damages in federal court, with the attendant right to a jury trial and the ability to recover punitive damages, nor does either permit damages to be sought against individual federal officers. See 41 U.S.C. § 7103(a)(1) (requiring aggrieved contractors to submit claims to a contracting officer for a decision); 5 U.S.C. § 7513(d) (providing that a federal employee against whom an adverse action is taken may appeal to the Merit Systems Protection Board). It would be incongruous if Atterbury, whom Congress excluded from both of these carefully drawn administrative schemes, were afforded access to a more liberal procedure for vindicating his rights than people or entities who, unlike Atterbury, are in privity with the United States, and to whom Congress has explicitly extended rights to challenge federal government action.

Atterbury responds that it would be equally, if not more, incongruous to leave employees of contractors without a remedy at all. But that argument is overstated. As we explain below, the APA provides Atterbury with an avenue for challenging his dismissal. And in any event, courts are not required to recognize a Bivens remedy even when a plaintiff would otherwise be completely

13

remediless. In <u>Dotson</u>, for example, we held that the CSRA barred a federal judicial branch employee's <u>Bivens</u> claim, despite the fact that the employee was otherwise entitled to no administrative or judicial review of the termination of his employment. <u>Dotson</u>, 398 F.3d at 168–69. Accordingly, the district court properly dismissed Atterbury's <u>Bivens</u> claim.

II.     Claim Under the APA

Atterbury brings his second claim under § 702 of the APA, which "permits a party to bring an equitable claim challenging arbitrary and capricious action of an administrative agency in federal district court and waives the government's sovereign immunity with respect to such claims in that forum." <u>Up State Fed. Credit Union v. Walker</u>, 198 F.3d 372, 375 (2d Cir. 1999). As a person alleging that he "suffer[ed] legal wrong because of agency action," 5 U.S.C. § 702, Atterbury was thus presumptively entitled to challenge USMS's decision to remove him from the Court Security Program.

But § 702 further specifies that "[n]othing herein . . . confers authority to grant relief if any other statute that grants consent to suit expressly or impliedly forbids the relief which is sought." <u>Id</u>. The government argues that the Tucker Act, 28 U.S.C. § 1491, which waives sovereign immunity with respect to "any

14

claim against the United States founded . . . upon any express or implied contract with the United States," and grants the Court of Federal Claims exclusive jurisdiction over such claims, is such a statute. "The Tucker Act impliedly forbids relief other than remedies provided by the Court of Federal Claims for actions that arise out of a contract with the United States." Up State, 198 F.3d at 375 (alteration and internal quotation marks omitted). The defendants argue, and the court below agreed, that Atterbury's APA claim in fact arises out of Akal's contract with USMS and is thus "impliedly forbid[den]" by the Tucker Act.

Whether a claim is in essence a contract claim over which the Court of Federal Claims has exclusive jurisdiction depends on a two-pronged analysis: a court must examine both "the source of the rights upon which the plaintiff bases [his] claims, and . . . the type of relief sought." Up State, 198 F.3d at 375, quoting Megapulse, Inc. v. Lewis, 672 F.2d 959, 968 (D.C. Cir. 1982). With respect to the first prong, the district court concluded that the source of the rights at issue was the Akal–USMS contract, reasoning that only that contract gave USMS the power to remove Atterbury from CSO duty. The right asserted by Atterbury here, however, is not USMS's right to dismiss Atterbury, but instead Atterbury's right to continued employment as a CSO. That right plainly does not arise from the

Akal–USMS contract, which instead provides that "[USMS] reserves the right at all times to determine the suitability of any Contractor employee to serve as a CSO," and that "[a]ny decision to continue a Contractor employee in a CSO capacity will be made solely by the Office of Court Security on a case-by-case basis." J.A. 42.

Atterbury does not ground his claim in any provision of Akal's contract with USMS. Instead, he grounds his alleged right to continued employment as a CSO in the CBA between Akal and its employees and in the Due Process Clause of the Fifth Amendment.[3] In Stein v. Board of the City of New York, 792 F.2d 13 (2d Cir. 1986), we recognized that an employee of a government contractor may under certain circumstances have a constitutionally protected property interest in continued employment. The plaintiff in that case was employed as a bus driver by a company that provided bus transportation for handicapped schoolchildren in New York City. Id. at 14. The company's agreement with the city required it

---

[3] It is true that the CBA allowed Akal to terminate an employee "without recourse" if USMS removed the employee from the Court Security Program. J.A. 11. In his R&R, the Magistrate Judge relied on this fact to conclude that Atterbury did not have a property interest in his continued employment. J.A. 284–89. But the district court did not adopt this reasoning from the R&R, and the defendants did not argue on appeal that this language eliminated the property interest otherwise created by the CBA's "just cause" provision. We therefore do not address the impact of this language, if any, on Atterbury's APA claim.

16

to employ only "persons of good moral character," while the plaintiff's contract with the company provided that he would not be discharged except for "just cause." Id. The plaintiff was terminated for falling below the standards of "good moral character," and brought a claim under 42 U.S.C. § 1983, alleging that he was not given adequate notice or a fair hearing. Id. at 15. We concluded that the "just cause" provision in the plaintiff's employment contract created a protected property interest or "claim of entitlement," and that the city had transgressed on that claim of entitlement by disqualifying the plaintiff under the "good moral character" provision. Id. at 16–17.

Atterbury's circumstances parallel those of the plaintiff in Stein. His complaint can fairly be read to allege that the CBA's just cause provision gave him a protected property interest in continued employment, see Ciambriello v. Cty. of Nassau, 292 F.3d 307, 314 (2d Cir. 2002) ("We have repeatedly recognized that a collective bargaining agreement may give rise to a property interest in continued employment."), and that USMS deprived him of that property interest without due process by unfairly determining that he had violated its performance standards.[4] Atterbury's insistence that he did not in fact violate the

_____

[4] Unlike the employer in Stein, Akal's business does not flow exclusively from its contract with the government. But the defendants have not argued, nor is there

17

performance standards simply raises factual questions going to the merits of his claim. It does not suggest that the performance standards, and thus the Akal–USMS contract, are themselves the source of the rights he is asserting.

Our conclusion is not altered by the fact that Akal's contract with USMS gives a CSO who is subject to removal fifteen days from the initial removal notice to respond in writing. The defendants argue that the procedural rights Atterbury seeks to assert are thus derived from the contract. As an initial matter, however, Atterbury is not a party to the Akal–USMS contract and has no standing to assert that it was breached. More importantly, the question of APA jurisdiction does not turn on whether the plaintiff could conceivably have based his claim on a government contract. Instead, the appropriate inquiry is whether the claim "is validly based on grounds other than a contractual relationship with the government." Megapulse, 672 F.2d at 968. Far from basing his claim on the procedural protections provided in the contract, Atterbury argues that those protections were inadequate to constitute due process, since he claims that he was denied due process despite having been accorded the contractual procedures. The Due Process Clause thus provides Atterbury with a basis for his

any basis in the record for us to infer, that Akal had any non-CSO positions open to which Atterbury could have been reassigned.

18

claim that is independent of the Akal–USMS contract.[5]

In that respect, this case is similar to <u>Megapulse</u>, in which the D.C. Circuit first devised the two-pronged test for distinguishing APA claims from "disguised" Tucker Act claims. The court in <u>Megapulse</u> held that the district court had APA subject-matter jurisdiction over a claim by a contractor that sought to enjoin the government from releasing certain confidential technical data. <u>Id</u>. at 969–70. Although a series of agreements between the government and the plaintiff placed limits on the government's use of those data, the court concluded that the claim was ultimately based "on an alleged governmental infringement of property rights and violation of the Trade Secrets Act." <u>Id</u>. at 969. In <u>Up State</u>, which involved a real estate dispute between a credit union and the Army, we distinguished <u>Megapulse</u>, on the grounds that the credit union's right "stem[med] from no independent, non-contractual source." <u>Up State</u>, 198 F.3d at 376. The credit union alleged only a vague "'failure of integrity and regularity of process' under the APA," <u>id</u>. at 375, but as the district court here correctly observed, "the APA is not itself a free-standing source of rights." J.A. 344. The Due Process Clause supplies Atterbury with the independent source of

---

[5] We express no view on the merits of that claim, which the district court did not reach, since it held that it lacked jurisdiction under the APA even to consider it.

rights that was missing from the credit union's claim in Up State.

"[S]o long as an action brought against the United States or an agency thereof is not one that should be classified from the outset as a 'contract action' for Tucker Act purposes, its remedies are also not contract-related . . . ." Megapulse, 672 F.2d at 971. Because Atterbury's claim is not based on rights derived from a contract with the United States, the first prong of the Megapulse test is determinative in this case. But we further note that the second prong, under which courts examine whether the remedies sought by the plaintiff are fundamentally contractual in nature, also supports our conclusion that the claim is not barred by the Tucker Act. The complaint seeks money damages for lost wages, loss of employment opportunities, and mental anguish and emotional distress, as well as declaratory relief and equitable relief in the form of reinstatement. With the exception of compensation for lost wages – Atterbury's possible entitlement to which does not derive from the Akal–USMS contract in any event – none of these remedies are generally available in contract actions.

Relying on the rule that actions seeking specific performance of a contract with the United States are barred by the Tucker Act, see Presidential Gardens Assocs. v. United States ex rel. Sec'y of Hous. & Urban Dev., 175 F.3d 132, 143 (2d

20

Cir. 1999), USMS suggests that Atterbury's request for reinstatement should be interpreted as in essence seeking specific performance of the Akal–USMS contract. That argument fails, however, because, as we have discussed, the Akal–USMS contract reserved to USMS's discretion the decision whether to continue to employ Atterbury as a CSO.[6]

In sum, because Atterbury's second claim has a basis independent of any contract with the United States, it does not fall within the scope of the Tucker Act. Accordingly, the district court had subject-matter jurisdiction under the APA to consider it. We do not reach the merits of Atterbury's APA claim, however, and leave it to the district court to determine, in the first instance, whether Atterbury has properly alleged that USMS acted arbitrarily and capriciously, or in a manner "contrary to constitutional right, power, privilege, or immunity," 5 U.S.C. § 706(2)(A), (B), in removing him from the Court Security Program.

---

[6] Further, although reinstatement is usually available as a remedy in statutory employment cases, the common-law rule is that employment contracts will not be specifically enforced. See Am. Law Inst., Restatement of Employment Law § 9.04(a) & cmts. b, c (2015). Thus, reinstatement cannot be construed as a contractual remedy that the Tucker Act makes unavailable in the federal district courts.

**CONCLUSION**

For the foregoing reasons, we affirm the district court's dismissal of Atterbury's <u>Bivens</u> claim, vacate its dismissal for lack of subject-matter jurisdiction of his claim under the APA, and remand the case for further proceedings consistent with this opinion.